IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

        v.                                      Criminal No. 3:22cr90 (DJN)

JERRELL LAMONT SMITH,
    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Jerrell Lamont Smith's ("Defendant") Motion to Suppress (ECF No. 16), moving the Court to suppress all evidence obtained by police during a November 19, 2021 traffic stop. The Government responded in opposition (ECF No. 20), and Defendant replied (ECF No. 21). On November 3, 2022, the Court held an evidentiary hearing on the Motion. During the hearing, the Court ordered that the parties submit supplemental briefing to address four recent Fourth Circuit cases. The parties submitted their supplemental briefs on November 17, 2022. (ECF Nos. 27, 28.) The Motion now stands ripe for decision. For the reasons set forth below, Defendant's Motion will be DENIED.

## I. BACKGROUND

### A. Procedural History

On June 21, 2022, the grand jury returned a two-count indictment (the "Indictment") against Defendant. (ECF No. 1.) The Indictment charges Defendant with Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), and Possession with the Intent to Distribute Heroin, Fentanyl, and Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (ECF No. 1.)

On September 28, 2022, Defendant filed a Motion to Suppress Evidence ("Mot." (ECF No. 16)), arguing that the police obtained the evidence against him through an unlawful seizure in violation of his Fourth Amendment rights. After the Government's Response (ECF No. 20) and Defendant's Reply (ECF No. 21), the Court held an evidentiary hearing on Defendant's Motion on November 3, 2022. (Tr. of Nov. Hr'g ("Tr.") (ECF No. 26).)

During the hearing, the Court heard testimony from Richmond Police Department ("RPD") Officer John Gilbert on behalf of the Government. (Tr. 7:1–45:19.) The Government also introduced video footage taken on the date of the traffic stop from Officer Gilbert's body-worn camera ("BWC"). (Gov't Ex. 1.) Defendant called no witnesses, relying strictly on his counsel's cross-examination of Officer Gilbert and a transcript of the BWC footage. (Def. Ex. 2 (ECF No. 16-1).) After viewing Officer Gilbert's testimony and considering the evidence admitted during the hearing, the Court found Officer Gilbert credible. (Tr. 52:2–52:7.) Based on Officer Gilbert's testimony, the evidence presented, and the submissions of the parties, the Court now makes the following findings of fact.

### B.      Findings of Fact

1. In the late evening hours of November 19, 2021, RPD officers John Gilbert and Brian Marceau were on patrol in the vicinity of Dill Avenue in Richmond, Virginia. (Tr. 8:13–9:11.)

2. The Dill Avenue corridor — an approximately four–block stretch of road intersecting the northern border of the City of Richmond — is known among RPD Officers as a high-crime area often used for drug trafficking and gang-related activities. (Tr. 10:20–11:11.)

3. At approximately 11:40 p.m., Officer Gilbert observed a white Lexus sedan traveling at a high rate of speed in a 25-miles-per-hour zone on Dill Avenue. (Tr. 9:12–21.) Without activating his patrol vehicle's emergency lights, Officer Gilbert paced[1] the sedan for approximately two blocks. (Tr. 9:18–10:8.) Officer Gilbert determined that the vehicle's

---

[1]      Officer Gilbert explained in his testimony that a police officer "paces" a vehicle by following behind the vehicle at a consistent distance, "matching the pace of that vehicle to get a varied speed" from the police officer's speedometer. (Tr. 10:2–5.)

speed fell between forty-five (45) and forty-eight (48) miles-per-hour. (Tr. 10:6–7.)

4. Officer Gilbert then initiated a traffic stop, and the vehicle promptly pulled to the side of the road. (Gov't Ex. 1 at 04:40:57–04:41:26.) With the vehicle stopped, Officer Gilbert approached the driver's side of the car, and Officer Marceau approached the passenger's side. (*Id.* at 04:41:30–04:41:40.)

5. Upon reaching the vehicle, Officer Gilbert introduced himself to Defendant, who was seated behind the wheel. (*Id.* at 04:41:40–04:41:42.) Officer Gilbert asked Defendant whether the car contained any weapons, drugs, grenades or similar items, to which Defendant responded "No." (*Id.* at 04:41:42–04:41:50.)

6. After explaining the reason for the stop (speeding), Officer Gilbert requested identification from Defendant and his front seat passenger. (*Id.* at 04:41:50–04:42:10.) Defendant provided his driver's license, and Defendant's passenger provided his social security number. (*Id.* at 04:42:10–04:42:21.)

7. Officer Gilbert briefly admonished Defendant's passenger for failing to wear his seatbelt, before asking Defendant, "Where are you coming from, my man?" (*Id.* at 04:42:19–04:42:25.) Defendant stated that he "was just coming from" his grandfather's house. (*Id.* at 04:42:26–04:42:28.)

8. During this exchange, Officer Gilbert noticed a strap — typical of those belonging "to a satchel bag that could be hung over the shoulder" — at Defendant's feet. (Tr. 15:15–18.) Officer Gilbert testified that the strap did not raise any suspicions at first glance. (Tr. 34:19–35:3.) Officer Gilbert further testified that he did not fear for his safety during this initial interaction with Defendant. (Tr. 15:7–15:10.)

9. As he turned to walk back to his patrol vehicle, Officer Gilbert instructed Defendant to roll down his rear driver's side window, explaining that he wanted to measure the window's tint. (Gov't Ex. 1 at 04:42:33–04:42:38.) Officer Gilbert continued, saying, "I don't plan on giving you a ticket for tint, but I'm going to let you know what they are because they're going to be illegal, alright?" (*Id.* at 04:42:37–04:42:41.) Officer Gilbert explained at the hearing that his routine practice is to give warnings, rather than tickets, for window tint violations. (Tr. 16:17–17:5.) Officer Gilbert then returned to his patrol vehicle. (Gov't Ex. 1 at 04:42:48–04:42:58.)

10. Upon return to his patrol car, Officer Gilbert ran both Defendant's and his passenger's information through RPD's police database inquiry systems. (Tr. 17:15–18:7.) The inquiry revealed that Defendant and his passenger were documented gang members. (Tr. 17:15–22.) The search confirmed, however, that neither was the subject of an active arrest warrant. (Tr. 35:6–8.)

11. While waiting on the results of the database inquiries, Officer Gilbert also inquired into the availability of any nearby K9 units, ultimately finding that no such units were available. (Tr. 18:8–17.)

3

12. Shortly before exiting his patrol vehicle to return to speaking with Defendant, Officer Gilbert received a radio transmission from a nearby officer. (Gov't Ex. 1 at 04:44:55–04:44:59.) In the transmission, the officer stated: "Hey, Gilbert, if you guys are about to wrap up soon, I think this guy's gone one." (*Id.*) Officer Gilbert interpreted this communication to mean that the nearby officer was "potentially behind a vehicle that has a warrant on file." (Tr. 22:4–17.) The nearby officer was therefore, in Officer Gilbert's understanding, requesting back up. (Tr. 22:4–17.) Given this transmission, Gilbert began to "expedite" the stop, deciding that he would neither issue Defendant a speeding ticket nor measure the tint of the Lexus' windows. (Tr. 22:20–23:10.)

13. Officer Gilbert then exited his patrol vehicle and returned to Defendant's driver's side window. (Gov't Ex. 1 at 04:46:33–04:46:46.) Officer Gilbert's exchange with Defendant resumed as follows:

| Officer Gilbert: | All right, Mr. Smith. Hey, I'm not going to write you a ticket today for speeding, all right? |
|---|---|
| Defendant: | I appreciate you, man. |
| Officer Gilbert: | I know it's a little cold outside. |
| Defendant: | Thank you, man. Thank you. |
| Officer Gilbert: | But you need to slow down. All right, man? |
| Defendant: | All right. |
| Officer Gilbert: | The amount of times that people ride around here, they drive bicycles all the way. They always cut through Fifth Avenue coming onto Dill. And you — they don't have lights. They don't have nothing on 'em, so you're going to — I don't want you to ruin your life hitting them. All right, man?[2] |
| Defendant: | Yeah. |

(*Id.* at 04:46:45 – 04:47:04.)

14. As this conversation occurred, Officer Gilbert again observed the bag strap at Defendant's feet. (Tr. 24:5–12.) Moreover, Officer Gilbert observed that the strap — and the now-visible bag to which the strap was attached — had moved since his initial conversation with Defendant. (Tr. 24:7–17.) Because the bag had been "manipulated"

---

[2]     Officer Gilbert returned Defendant's driver's license to him as Officer Gilbert spoke these words. (Gov't Ex. 1. at 04:46:52.) Officer Gilbert testified that once he returned Defendant's license, the traffic stop was complete and Defendant was free to leave. (Tr. 24:2-4.)

while he was away, Officer Gilbert grew suspicious that the bag contained a firearm.  (Tr. 24:7–25:4.)

15. Given his suspicions, Officer Gilbert initiated the following colloquy:

| Officer Gilbert: | Is that a weapon underneath here, man?  What's the — what's the bag right here? |
| --- | --- |
| Defendant: | Oh no.  That's just a bag.  I just carry around a little — throw my phones in, and stuff. |
| Officer Gilbert: | But there's no weapons?  Do you mind if I check it for weapons, man? |
| Defendant: | Yeah.  There's nothing in there.  There's nothing here. |
| Officer Gilbert: | You mind if I check real quick before I get you out of here, brother? |
| Defendant: | Yeah, it ain't nothing. |

(Gov't Ex. 1. at 04:47:05–04:47:23.)[3]

16. As this conversation occurred, Defendant removed the bag from underneath his seat.  (*Id.* at 04:47:14–04:47:16.)  With the bag in hand, Defendant squeezed it at various spots, as if to demonstrate the absence of a weapon.  (*Id.* at 04:47:17–04:47:20.)

17. As Officer Gilbert asked to see Defendant's bag for the third and final time, Defendant unzipped and opened the bag.  (*Id.* at 04:47:21–04:47:22.)  Defendant then held the bag open for Officer Gilbert to examine.  (*Id.* at 04:47:22–04:47:24.)  Officer Gilbert aimed his flashlight at the bag and surveyed its contents.  (*Id.* at 04:47:23–04:47:25.)  Though not visible in the BWC footage, Officer Gilbert testified that he observed within the bag a knotted baggie corner containing a white, rock-like substance.  (Tr. 28:14–21.)

18. Officer Gilbert then instructed Defendant to exit the vehicle and handcuffed him.  (*Id.* at 04:47:26–04:47:42.)  A subsequent search of Defendant's bag produced two knotted baggies, one containing crack-cocaine and one containing heroin.  (Tr. 29:16–31:4.)  A search of Defendant's vehicle also produced a firearm.  (Tr. 31:9–12.)

This evidence precipitated the instant charges.

---

[3]     Although the transcript appears to indicate that Defendant objected to Officer Gilbert examining the bag, the actual video shows otherwise.  Defendant was fully cooperative with Officer Gilbert and agreed to the search of the bag.  As a result, the Court finds as a matter of fact that Defendant consented to the search of the bag at issue.

## II.   ANALYSIS

Defendant moves to suppress the firearm and narcotics evidence that the police seized during the search of his bag and vehicle.  In support of his Motion, Defendant offers two arguments.  First, Defendant contends that Officer Gilbert impermissibly prolonged the traffic stop to investigate matters unrelated to the stop's purpose — that is, Officer Gilbert wrongly prolonged a stop for speeding to investigate the contents of Defendant's bag.  To justify prolonging the stop, Defendant argues, Officer Gilbert needed either (1) a reasonable suspicion of criminal activity or (2) Defendant's consent to continued seizure.  Because he lacked both, Defendant concludes, Officer Gilbert violated Defendant's Fourth Amendment rights as set forth in the Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. 348 (2015).

Second, Defendant contends that he did not consent to the search of his bag, as Officer Gilbert's body language and "persistent questioning" indicated to Defendant that he could not decline Officer Gilbert's requests.  (Mot. 5–6.)  Despite opening and displaying the bag himself, Defendant argues that his "mere acquiescence" in the face of Officer Gilbert's continued questioning "is not sufficient to prove voluntary consent."  (Mot. 5.)

The Court disagrees with Defendant's assessment on both fronts.  The Court first finds that Officer Gilbert inquired into the contents of Defendant's bag out of concern for his and Officer Marceau's safety — an interest closely tied to the stop's purpose.  *United States v. Buzzard*, 1 F.4th 198, 203–04 (4th Cir. 2021).  The Court therefore holds that Officer Gilbert did not impermissibly prolong the stop by inquiring into the contents of Defendant's bag.  *Id.*  The Court further finds that Defendant consented to a search of his bag when he held the unzipped bag out for Officer Gilbert to observe.  *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019).  Accordingly, the Court finds that Officer Gilbert did not violate Defendant's Fourth Amendment rights.  The Court will therefore DENY Defendant's Motion (ECF No. 16).

6

A.      **Governing Law**

1.      **Traffic Stops Under the Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

amend. IV.  Thus, "the underlying command of the Fourth Amendment is always that searches

and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).

When law enforcement stops a vehicle and detains its occupants, the stop constitutes a

seizure under the Fourth Amendment, "no matter how brief the stop or how limited its purpose."

*United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).  Courts assess the reasonableness of

traffic stops — as with other investigatory seizures — under the two-prong framework

announced in *Terry v. Ohio*, 392 U.S. 1 (1968).  Pursuant to *Terry*, the Court asks (1) whether

the officer's actions were legitimate at their inception and (2) whether the officer's actions

"during the traffic stop were reasonably related in scope to the bases for the seizure." *United*

*States v. Palmer*, 820 F.3d 640, 648–49 (4th Cir. 2016).

Under *Terry*'s first prong, an initial stop proves legitimate where "the officer [has]

probable cause to believe a traffic violation occurred." *United States v. Miller*, 2022 WL

17259018, at *5 (4th Cir. Nov. 29, 2022).  Naturally, the police have probable cause to believe a

traffic violation occurred when they themselves witness such a violation. *United States v.*

*Branch*, 537 F.3d at 335.

Under *Terry*'s second prong, law enforcement may detain a driver only for as long as it

takes to effectuate the stop's mission:  "address[ing] the traffic violation that warranted the stop

*and* attend[ing] to related safety concerns." *Rodriguez*, 575 U.S. at 354 (emphasis added).  An

officer addresses the underlying traffic violation first and foremost by "determining whether to

7

issue a traffic ticket." *Id.* Beyond that determination, however, "an officer's mission [also] includes ordinary inquiries incident to [a] traffic stop." *Id.* at 355 (cleaned up). These inquiries may consist of "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022).

Law enforcement may also attend to officer safety concerns, as "the government's officer safety interest stems from the mission of the stop itself." *Id.* Because "[t]raffic stops are especially fraught with danger to police officers, . . . an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 356. These precautions remain permissible so long as they do not constitute "[o]n-scene investigation into other crimes" or "safety precautions taken in order to facilitate such detours." *Id.*; *see also United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (noting that police may not "extend an otherwise-completed traffic stop in order to conduct . . . unrelated investigations") (cleaned up). Relevant here, the Fourth Circuit has held that an officer's interest in his own safety justifies asking the driver of a seized vehicle whether the vehicle contains any illegal items. *Buzzard*, 1 F.4th at 203. Such an inquiry "could expose dangerous weapons or narcotics" and therefore relates to officer safety "at least as much as searching for traffic warrants." *Id.*

At bottom, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." *Rodriguez*, 585 U.S. at 354. An officer can prolong a traffic stop beyond such point "only if the driver gives consent or if there is reasonable suspicion that an illegal activity is occurring." *Bernard*, 927 F.3d at 805. Absent consent or reasonable suspicion, "[e]ven a de minimis extension [of the stop] violates the Fourth Amendment." *Miller*, 2022 WL 17259018, at *5.

## 2.    Consent to Warrantless Searches

The Fourth Amendment's reasonableness requirement generally prohibits warrantless searches. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). Valid consent, however, constitutes "a well-recognized exception to the Fourth Amendment's prohibition against warrantless searches." *United States v. Toyer*, 414 F. App'x 584, 588 (4th Cir. 2011). "A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant." *United States v. Perrin*, 45 F.3d 869, 845 (4th Cir. 1995). Consent proves valid if offered (1) knowingly, (2) voluntarily and (3) by one with authority to consent. *United States v. Buckner*, 47 F.3d 551, 554 (4th Cir. 2007). Where a search's propriety rests on the defendant's consent, the Government must show by a preponderance of the evidence that it obtained valid consent. *Id.*

In examining a defendant's purported consent to search, the Court must consider the totality of the circumstances. *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). Germane factors include "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Id.* The Court may also consider whether the defendant knew that he could withhold consent, but the Government need not show that the defendant knew of his right to refuse consent to prove that defendant consented voluntarily. *Id.* Importantly, mere acquiescence by the individual searched will not satisfy the Government's burden. *Bumper v. North Carolina*, 391 U.S. 543, 548–89 (1968).

### B.    Discussion

With these legal principles in hand, the Court turns to consider Defendant's Motion.  The Court first finds that Officer Gilbert did not impermissibly prolong the traffic stop to undertake an unrelated investigation, as his final colloquy with Defendant — which addressed his concern that Defendant possessed a firearm — constituted exactly the kind of "negligibly burdensome precaution" in furtherance of officer safety that the Supreme Court deemed permissible in *Rodriguez*.  575 U.S. at 356; *see also Terry*, 392 U.S. at 23 (recognizing a police officer's "immediate interest . . . in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him").  The Court next finds that Officer Gilbert did not violate Defendant's Fourth Amendment rights in conducting a warrantless search of his bag, as Defendant voluntarily consented to the search when holding his bag out, unzipped, for Officer Gilbert to examine.  *United States v. Brugal*, 209 F.3d 353, 362 (4th Cir. 2000).  Because the Court finds that neither Officer Gilbert's questions nor his warrantless search of Defendant's bag violated Defendant's Fourth Amendment rights, Defendant's motion fails.

### 1.    Officer Safety Concerns Justified Officer Gilbert's Additional Questions

Defendant concedes that Officer Gilbert justifiably stopped him for speeding, (Mot. at 4), and the Court therefore need not address *Terry*'s first prong.  As to *Terry*'s second prong, Defendant argues that Officer Gilbert impermissibly prolonged the traffic stop by inquiring into the contents of Defendant's bag, an inquiry "outside the scope of the initial stop" and "aimed at detecting criminal activity more generally."  (Def.'s Suppl. Br. at 8.)  The Court disagrees, finding that Officer Gilbert's questions arose from his "legitimate and weighty" interest in both his own safety and that of his fellow officer.  *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).

10

Because this interest in officer safety "stems from the mission of the stop itself," the Court finds that Officer Gilbert's line of questioning concerning Defendant's bag did not impermissibly prolong the stop. *Rodriguez*, 575 U.S. at 356.

Officer Gilbert's testimony establishes that he questioned Defendant about the contents of Defendant's bag out of concern for his safety and the safety of his partner, Officer Marceau. (Tr. 24:5–25:15.) Indeed, the traffic stop had ended and Officer Gilbert was about to release Defendant when the officer noticed a strap that he deduced was likely connected to a shoulder bag, which he had observed during his initial interaction with Defendant. (Tr. 15:15–15:18.) Though the strap did not raise safety concerns at first glance (Tr. 19:10–19:24), Officer Gilbert testified that the bag to which the strap was connected had clearly moved from its initial position by the time that Officer Gilbert returned to speak with Defendant for a second time. (Tr. 19:14–19:24, 24:7–25:4, 27:24–28:4.) Because Defendant had "manipulated" the bag while Officer Gilbert was in his patrol vehicle, Officer Gilbert suspected that the bag contained a firearm. (Tr. 24:21–25:4.) Officer Gilbert's experience with the Dill Avenue corridor — a "major thoroughfare" for guns — heightened this intuition. (Tr. 18:22–19:6.) Officer Gilbert's suspicion then led to legitimate and serious safety concerns — most notably, a concern that Defendant might "ambush" Officers Gilbert and Marceau as they returned to their patrol vehicle. (Tr. 24:21–25:1.)

Officer Gilbert's effort to ensure his and Officer Marceau's safety by inquiring into the contents of Defendant's bag was therefore not, as Defendant contends, a departure from "tasks related to the traffic stop." (Def.'s Suppl. Br. at 8.) Rather, Officer Gilbert's questions constituted an outgrowth of the government's interest in officer safety, an interest that the Supreme Court has said "stems from the mission of the [traffic] stop itself." *Rodriguez*, 575 U.S.

11

at 356. Law enforcement may, within the confines of the Fourth Amendment, impose negligible inconveniences during traffic stops when "attend[ing] to related safety concerns." *Perez*, 30 F.4th at 378 (quoting *Rodriguez*, 575 U.S. at 354). Officer Gilbert's questions amounted to nothing more than one of these negligible inconveniences, and the colloquy concerning Defendant's bag thus did not prolong the stop beyond its constitutional limits. *Id.* The Fourth Circuit's decisions in *Palmer*, *Hill* and *Buzzard* helpfully demonstrate the applicable principle. *Palmer*, 820 F.3d at 51–53; *United States v. Hill*, 852 F.3d 377, 383–84 (4th Cir. 2017); *Buzzard*, 1 F.4th at 203–04.

In *Palmer*, the defendant challenged the arresting officer's decision to conduct a criminal record search after stopping him for a window tint violation, arguing that the search "unreasonably expanded the scope of the stop by beginning an unjustified drug investigation." 820 F.3d at 651. The Fourth Circuit upheld the denial of the defendant's motion to suppress, noting that the officer's "legitimate concern for his own safety" justified delving into the defendant's criminal history, particularly in light of the defendant's suspected gang membership. *Id.* at 655 (quoting *United States v. Green*, 740 F.3d 275 (4th Cir. 2014)). The officer's "brief investigation," the court held, "fell squarely within the range of actions permitted under *Terry*'s second prong." *Id.* at 651.

The Fourth Circuit spoke similarly in *Hill*. 852 F.3d at 383–84. There, the arresting officers "allocate[d] duties at the scene of the traffic stop" between themselves, posting one officer at the vehicle's passenger door while the other conducted a police database search in their cruiser. *Id.* The defendant, whose ensuing conversation with the posted officer led to his admission that he unlawfully possessed a firearm, moved to suppress the evidence. *Id.* at 379. In his motion, the defendant argued that the officers unreasonably prolonged the stop, as the

posted officer could have instead expedited the roadside detention by assisting his partner in

conducting database searches and writing summonses. *Id.* at 383. The Fourth Circuit saw it

differently, affirming the district court's denial of the defendant's motion to suppress and finding

that the officers' decision to monitor the vehicle's occupants proved reasonable in light of "the

inherent risks involved in . . . traffic stops." *Id.* at 384.

The Fourth Circuit again reiterated the inherent relationship between a traffic stop's

mission and the government's interest in officer safety in *Buzzard.* 1 F.4th at 203–04. There, a

West Virginia police officer initiated a traffic stop based on the defendants' defective brake light.

*Id.* at 200. While waiting for backup, the officer asked the defendants whether their vehicle

contained any illegal items. *Id.* at 203. In their motions to suppress, the defendants challenged

this inquiry as "directed toward general law enforcement goals" rather than "the basis for the

traffic stop or concerns for officer safety." *Id.* Because the question "wasn't related to the traffic

stop's mission," the defendants argued, the officer had "unlawfully prolonged the stop." *Id.* at

201.

The Fourth Circuit affirmed the district court's denial of the defendants' motions. *Id.* at

205. Approving the lower court's reasoning, the Fourth Circuit held that the officer's blanket

inquiry as to illegal items "related to officer safety and thus related to the traffic stop's mission."

*Id.* at 204. In so holding, the court highlighted "the time of night" that stop occurred and "the

high drug area" through which the defendants were traveling. *Id.* at 203. "Given the totality of

the circumstances," the court held, "it makes sense that [the officer] needed to know more about

what [the defendants] had in the car." *Id.*[4]

---

[4]      Defendant attempts to distinguish *Buzzard* by highlighting that the officer there asked if
the defendant's vehicle contained any illegal items "mid-stop," while Officer Gilbert's line of
questioning began only after the stop was, in Officer Gilbert's understanding, completed. (Def.'s

Officer Gilbert's inquiry into the contents of Defendant's bag mirrors the actions that the Fourth Circuit found permissible in *Palmer*, *Hill* and *Buzzard*. *Palmer*, 820 F.3d at 51–53; *Hill*, 852 F.3d 377, 383–84 (4th Cir. 2017); *Buzzard*, 1 F.4th at 203–04. Though Officer Gilbert initially stopped Defendant for speeding, Defendant's manipulation of the bag, combined with Dill Avenue's reputation as a major thoroughfare for firearms, alerted Officer Gilbert to a potential risk to his and Officer Marceau's safety. Importantly, this interaction occurred after Officer Gilbert had already decided to release Defendant without issuing a ticket, so the officer could support another officer engaged in a different traffic stop. Yet, after observing the moved bag, Officer Gilbert asked — in a line of questioning lasting fewer than forty-five seconds — whether Defendant was armed to ensure his and his fellow officer's safety. Just as asking whether a defendant's vehicle contains any illegal items or conducting a brief criminal record search amounts to a "negligibly burdensome precaution," so too did Officer Gilbert's questions regarding the contents of Defendant's bag. *Palmer*, 820 F.3d at 651. Officer Gilbert's interest in his own safety and the safety of his partner proved part and parcel of the stop's mission, and the Court will not second-guess his decision to further that mission by ensuring that Defendant was not armed. *See Hill*, 852 F.3d at 384 (noting that "*Rodriguez* does not require courts to second-

---

Suppl. Br. at 8.) The Court need not pause long on this distinction, however, as the timing of the officer's question in *Buzzard* was not essential to the court's holding. 1 F.4th at 204. Rather, the Fourth Circuit's opinion offers two independent and equally sufficient grounds on which it affirmed the district court. *Id.* First, and relevant for the Court's purposes here, the Fourth Circuit held that the officer's question — which concerned officer safety — related to the stop's mission and thus did not unconstitutionally expand the scope of the stop. *Id.* at 202–04. Second, and independent of this finding, the court further found that the officer's question occurred before the officer had completed his "customary checks" — i.e., "mid-stop." *Id.* at 204. Accordingly, the court held that even if the question "exceeded the scope of the stop's mission," it passed muster under *Rodriguez*, because it "didn't extend the stop by even a second." *Id.* The Fourth Circuit discussed this second finding separately, and its opinion made clear that either finding, standing alone, would prove sufficient to hold that the officer upheld the defendant's Fourth Amendment rights. *Id.*

14

guess the logistical choices and actions of a police officer that, individually and collectively, were completed diligently within the confines of a lawful traffic stop"). Because Officer Gilbert "acted with reasonable diligence in executing the tasks incident to the traffic stop," including when inquiring into the contents of Defendant's bag, the Court holds that the stop was not impermissibly expanded in scope or duration. *Id.* Officer Gilbert's questions therefore did not violate Defendant's Fourth Amendment rights. *Id.*

### 2. Defendant Voluntarily Consented to a Search of His Bag

The Government contends that Officer Gilbert's warrantless search of Defendant's bag did not violate Defendant's Fourth Amendment rights, because Defendant voluntarily consented to the search. (Resp. 7–9.) Defendant argues that his "mere acquiescence" to Officer Gilbert's request fails to demonstrate that he voluntarily consented. (Mot. 5.) The Court agrees with the Government, finding, as a matter of fact, that the totality of the circumstances plainly demonstrate that Defendant consented to the search. *Brugal*, 209 F.3d at 362.

First, Defendant's age and experience militate against a finding that Officer Gilbert strong-armed his consent. *Lattimore*, 87 F.3d at 650 (including the defendant's "age" and "experience" among the circumstances relevant to determining consent). On the date of the stop, Defendant was thirty-four years old. (Tr. 46:21–25.) Planted firmly within his prime adult years, Defendant was neither so youthful nor so elderly as to make him an easy target for undue influence. *See United States v. Price*, 558 F.3d 270, 279–80 (3d Cir. 2009) (holding that questioned individual's "average" age weighed in favor of a finding of voluntary consent); *United States v. Harris*, 2016 WL 554827, at *5 (E.D. Va. Feb. 10, 2016) (noting that the defendant, at age 33, "likely understood his rights"). Moreover, the first count in the Indictment (ECF No. 1), possession of a firearm and ammunition by a convicted felon, in violation of 18

15

U.S.C. § 922(g)(1), suggests that Defendant was not unfamiliar with the criminal justice system when interacting with Officer Gilbert. *See United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) (noting that Defendant's prior felony convictions "suggest [defendant] was not a newcomer to the law.").

Officer Gilbert's conduct similarly indicates that Defendant voluntarily consented. During the approximately eighteen-second exchange during which Defendant gave consent, Officer Gilbert spoke in a calm, non-aggressive tone. (Gov't Ex. 1. at 04:47:05–04:47:23.) This tone reflected the broader tenor of the stop, which remained cordial and polite throughout. *See United States v. Robertson*, 736 F.3d 677, 681 (4th Cir. 2022) (interactions "characterized by relaxed, friendly conversation between the two sides" indicate voluntary consent); *United States v. Contreras*, 506 F.3d 1031, 1037 (4th Cir. 2007) (officers' "casual phrasing of [his] request" suggested absence of coercion). Officer Gilbert did not accuse Defendant of doing anything illegal, but instead explained in plain language the reason that he sought Defendant's consent to look in the bag. *Cf. Robertson*, 736 F.3d at 680–81 (officer's "immediately accusatory" manner suggested lack of consent). Moreover, Officer Gilbert never threatened Defendant with arrest or the use of force. *Lattimore*, 87 F.3d at 651 (finding consent and noting that "at no time did the officer use force or a threat of force to coerce [the defendant]'s consent"). Indeed, before observing the moved strap, Officer Gilbert conveyed to Defendant that the officer was releasing Defendant without issuing a ticket to him. Finally, though Officers Gilbert and Marceau flanked Defendant's vehicle during the stop, neither officer engaged in the type of threatening or intimidating conduct that courts have found to amount to a coercive "show of force." *Compare United States v. Drayton*, 536 U.S. 194, 204 (2002) (finding "nothing coercive or confrontational" in the presence of three officers questioning bus passengers where "[t]here was

no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice") *with Robertson*, 736 F.3d at 679–80 (finding lack of consent where the scene "was dominated by police officers," the defendant observed nearby individuals "get handled by" other officers, and the questioning officer blocked defendant's exit).

Most critically, Defendant's words, demeanor, and conduct strongly suggest that he voluntarily consented to the search. *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) ("[C]onsent may be inferred from actions as well as words.").[5] Defendant maintained a friendly and casual tone with Officer Gilbert throughout the stop, repeatedly responding "yeah" in lieu of "yes" or "yes sir" and twice calling Officer Gilbert "man." (Gov't Ex. 1. at 04:46:45–04:46:52.) Indeed, Defendant's responses to Officer Gilbert's requests carry an air of nonchalance — "Yeah, it ain't nothing." — suggesting that Defendant felt unbothered, and certainly not coerced, by Officer Gilbert's inquiries. *Cf. United States v. Wilson*, 895 F.3d 168, 172 (4th Cir. 1990) (finding that defendant consented to a pat-down search when responding to officer's request by "shrugging his shoulders and raising his arms"). Most importantly, Defendant lifted his bag from the floorboard, unzipped the bag, and held out the bag towards Officer Gilbert all on his own accord. (Gov't Ex. 1 at 04:47:09–04:47:24.) Defendant did so while seated in his vehicle and *after* Officer Gilbert returned his license. *See United States v. Rusher*, 966 F.2d 868, 872 (4th Cir. 1992) (finding warrantless search valid where officer, after returning the defendant's license, asked permission to search the defendant's truck and defendant orally consented);

---

[5]      Though the unadorned words in the transcript might, at first blush, suggest that Defendant refused Officer Gilbert's request, the transcript proves misleading without the accompanying BWC footage.  When combined with his demeanor, tone and body language — which are evident only through viewing the BWC footage — Defendant's words demonstrate his earnest effort to *voluntarily* fulfill Officer Gilbert's request.

*Lattimore*, 87 F.3d at 653 (finding warrantless search valid where officer sought permission "after the officer had issued the citations and returned [the defendant]'s driver's license, indicating that all business with [the defendant] was completed and he was free to leave"). Nothing in Defendant's words or actions suggests that he felt coerced into consenting to the search.

Because the Court finds, as a factual matter, that Defendant voluntarily consented to Officer Gilbert's request to search his bag, the Court accordingly holds that Officer Gilbert did not violate Defendant's Fourth Amendment rights in conducting the search. *Bernard*, 927 F.3d at 805.

### III. CONCLUSION

For the aforementioned reasons, the Court finds that Officer Gilbert upheld Defendant's Fourth Amendment rights in conducting the November 19, 2021 traffic stop. Accordingly, the Court will DENY Defendant's Motion to Suppress. (ECF No. 16.)

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: January 3, 2023

18